UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL HESSONG,<br><br>    Plaintiff,<br><br>    v.<br><br>PINTEREST, INC., et al.,<br><br>    Defendants. | Case No. 20-cv-08243-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 32 |

Plaintiff Paul Hessong brings this class action case for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against defendants Pinterest, Inc., Ben Silbermann (Pinterest's co-founder, President and Chief Executive Officer ("CEO")), and Todd Morgenfeld (Pinterest's Chief Financial Officer and Head of Business Operations ("CFO")).  Hessong asserts that defendants made numerous materially false or misleading statements and failed to disclose material facts: (i) that Pinterest's "addressable market in the U.S. was reaching its maximum capacity"; (ii) that the then current status of the business significantly "decelerated Pinterest's future ability to monetize" on U.S. average revenue per user ("ARPU"); and (iii) that "Pinterest was at an increased risk of losing advertising revenue."  Amended Complaint ("FAC," Dkt. No. 31) ¶ 35.

Defendants move to dismiss because Hessong fails to meet the heightened pleading standards imposed under the Private Securities Litigation Reform Act ("PSLRA," 15 U.S.C. § 78u–4(b)) for both falsity and scienter.  I agree.  Defendants' motion is GRANTED with leave to amend.

## BACKGROUND

Pinterest is a visual discovery search engine consisting of "pins" that are either linked from a website or uploaded by a user grouped in themes called "boards" to create different virtual

albums. FAC ¶ 17. Pinterest's primary source of revenue is selling advertising. FAC ¶ 19. Hessong alleges Pinterest "measures the monetization of its platform" through "Average Revenue per User ('ARPU'), which is the total revenue in a given geography during a period divided by the average of the number of monthly active users ('MAUs') in that geography." FAC ¶ 20. He contends "that ARPU is a critically important metric for Pinterest" and that "Pinterest closely monitors the Company's ARPU." *Id*. Because ARPU for domestic U.S. users far exceeds the ARPU for international users, Hessong asserts that "Pinterest's ability to grow its domestic active user base is of great importance to its overall ability to generate revenue and is a critically important metric for the market and investors." *Id*.

Pinterest filed its Initial Public Offering on March 22, 2019 and started trading publicly on April 18, 2019. FAC ¶ 17. Hessong alleges that immediately after going public, Pinterest undertook an "aggressive campaign to convince investors of its future growth and monetization opportunities." *Id*. ¶ 21. As part of that campaign, in the months following the April 2019 IPO, defendants allegedly misrepresented to the investing public the market opportunities that purportedly existed that would allow Pinterest to grow and scale its business on the domestic market. *Id*.

## I. FALSE OR MISLEADING STATEMENTS

Hessong alleges defendants made the following false or misleading statements in the class period, starting on May 16, 2019:

- In a May 16, 2019 Press Release, announcing its financial results for the first quarter of 2019, Defendant Morgenfeld stated that defendants "were particularly encouraged by the strength we saw in U.S. revenue and international user growth." FAC ¶ 23.

- In Pinterest's 10-Q quarterly report filed on May 17, 2019, Pinterest reported it reached "291 million MAUs, representing a 22% year-over- year growth" and as to revenue generated from MAUs, Pinterest stated:

   > Revenue based on the geographic location of our users increased by 51% in the United States to $187.0 million and by 107% internationally to $14.9 million. ***U.S. revenue***

2

>   *growth was driven by a 7% increase in average U.S. MAUs* and a 41% increase in U.S. ARPU. International revenue growth was driven by a 30% increase in average international MAUs and a 59% increase in international ARPU. *ARPU growth in the U.S. and internationally was driven by higher monetization of both of those user bases largely due to an increase in the number of advertisements delivered as a result of an increase in the overall number of advertisers on our platform and increased demand from existing advertisers*.

FAC ¶ 24 (emphasis in original).

- The Q1 2019 Report explained Pinterest's "revenue in the United States is higher primarily due to our decision to focus our earliest monetization efforts there and also due to the relative size and maturity of the U.S. digital advertising market" giving the same reason for "a higher U.S. ARPU." FAC ¶ 25.

- In a May 16, 2019 letter to shareholders, Pinterest stated, "We are encouraged by *strong underlying trends in U.S. ARPU* and user growth in international markets" and allegedly "provided shareholders with an unrealistic outlook on its future U.S. revenue" by assuring investors of the continued growth in both the U.S. and international markets by claiming "*We expect to maintain strong momentum in our business as we achieve larger scale. We expect revenue to grow 40%-43%* compared to full-year 2018, *driven by improving ARPU, particularly in the U.S. We expect to grow users in both the U.S. and International*." *Id*. ¶ 26 (emphasis in original).

- During the Q1 2019 Earnings Call on May 16, 2019, Defendant Morgenfeld assured investors that the U.S. market would continue to grow, stating: "[*We*] *see comfortable room* in all of our markets, in particular in international markets *but also in the US*, to continue to drive advertising content higher." *Id*. ¶ 27 (emphasis in original).

- In an August 1, 2019 press release, Defendant Morgenfeld stated the Company "*remain encouraged by trends in U.S. ARPU and by user growth in international markets*." *Id*. ¶ 28 (emphasis in original).

- In an August 1, 2019 letter to shareholders, the Company "touted" its growing MAU and highlighted the "strong trends in U.S. average revenue per user (ARPU) and user growth in international markets and the "unrealistic" expectation that "We expect

3

revenue to grow 45-48% in 2019 compared to full-year 2018, driven by improving ARPU, *particularly in the U.S. We expect to grow users in both the U.S.* and international. Consistent with trends in recent years, we expect to grow International users at a faster pace relative to the U.S." *Id*. ¶ 29 (emphasis in original).

- In the August 1, 2019 Q2 2019 Earnings Call, Silbermann touted Pinterest's 62% growth year-over-year and Pinterest's attainment of "more than 300 million people now using Pinterest every month." *Id*. ¶ 30.  Defendant Morgenfeld stated "[W]e continue to accelerate the growth in the number of advertisers on the platform. We talked last quarter about having done that and we accelerated yet again in the number of advertisers this quarter as well" and "[l]onger term, we would expect price to continue to improve because advertisers tell us that they're getting a great return from their investment on Pinterest. So today the exercise is trying to get as many advertisers on the platform. So that they all see the value and help us build a lot more robust auction." *Id*. ¶ 30.

- In response to a question about whether the U.S. MAUs would "pick up" in the next two quarters, Morgenfeld stated "[i]n terms of the U.S. MAUs, we grew 13% year-over-year off of a pretty soft comp last year because of changes to the SEO algorithm and some of the identify and authentication partners that had changed the way that things operated. So we were benefiting from that in Q2 from a year-over-year comparison perspective. But as you know, Q2 is our softest quarter from a user growth perspective sequentially. And so we expected flattish seasonality from Q1 to Q2, and that's what we saw. I would expect typical seasonality to pick up over the course of the remainder of the year. *But again, U.S. growth will be far behind overall growth where we're less mature*." *Id*. ¶ 31 (emphasis in original).

- In the 10-Q second quarterly report filed on August 2, 2019, Pinterest reiterated reaching U.S. ARPU of $2.80 (a growth of 41%, compared to the three months ended June 30, 2018), and as to the revenue generated from domestic and international users, stated:

4

> For the three and six months ended June 30, 2019, **U.S. revenue growth was driven by 41% and 39% respective increases in U.S. ARPU supported by a 13% increase in U.S. MAUs**, and international revenue growth was driven by 123% and 89% respective increases in international ARPU supported by a 38% increase in international MAUs. **ARPU growth in the U.S. and internationally was driven by higher monetization of both of those user bases largely due to an increase in advertising demand from new and existing advertisers on our platform.** This resulted in an increase in the number of advertisements served as well as an increase in the price of advertisements, but the impact of the latter was not significant.

*Id*. ¶ 32 (emphasis in original).

## II.  OCTOBER 31, 2019 DISCLOSURES

Hessong contends that the "truth emerged" in Pinterest's third quarter earnings disclosures made on October 31, 2019. That truth, according to Hessong, was that while Pinterest's U.S. MAUs grew by 8 percent year-over-year, that "growth" in fact "represented a 6-point deceleration from the previous quarter and a 2-point deceleration on a 2-year basis" and led to Pinterest missing its revenue target and materially missing the most critical metric of its performance — revenue derived from U.S. advertising. FAC ¶ 36. On this news, Hessong alleges that the price of Pinterest's shares "steeply declined by 17%, to close at $20.86, on November 1, 2019, on unusually high trading volume." *Id*. ¶ 37. Hessong notes that upon that news, third-party analysts lowered Pinterest's price target. *Id.* ¶ 40. The Class Period alleged ends following the October 31, 2019 disclosures, on November 1, 2019. *Id.* ¶ 2. Hessong asserts that Pinterest's fourth quarter and full year 2019 results, released post-class period on February 6, 2020, again reported only an 8 percent increase in U.S. MAUs from 2018, and only an 8 percent increase from the third quarter, which he characterizes as "negligible growth" for U.S. MAUs. *Id.* ¶ 41.

## III.  ADDITIONAL JUDICIALLY NOTICEABLE FACTS

In support of their motion, defendants ask me to take judicial notice of various undisputed facts that are either incorporated by reference into plaintiff's FAC[1] or subject to judicial notice

---

[1] Exhibits to the Declaration of Drew Liming [Dkt. No. 33], Ex. E (Form 8-K filed with SEC on October 31, 2019, referenced FAC ¶ 36.2); Ex. F (Form 8-K filed with SEC February 6, 2020, referenced FAC ¶ 41); Ex. J (Form 10-Q filed with SEC September 30, 2019, referenced FAC ¶ 36); Ex. K (Form 10-Q filed with SEC May 6, 2020, referenced FAC ¶ 42); Ex. L (Form 10-Q filed with SEC July 31, 2020, referenced FAC ¶¶ 32–34); Ex. O (Form 10-Q filed with SEC May 17, 2019, referenced FAC ¶¶ 24–25).

5

based on public filings.[2] Dkt. No. 34. Plaintiff does not oppose or otherwise dispute that the filing of these documents, and the disclosure of their contents to the market, may be judicially noticed. Defendants' request for judicial notice is GRANTED.

Defendants point out that the financial first quarter 2019 financial results accurately disclosed that MAUs had grown to 85 million in the U.S., 3 million more than the previous quarter. Ex. A at 72, Ex. C at Ex. 99.2 at 1. Pinterest's ARPU had also increased 26 percent year-over-year. Ex. C at Ex. 99.2 at 1. In August 2019, in its second quarter results, Pinterest reported its global MAUs increased by 9 million, but its U.S. MAUs remained the same. Ex. D at Ex. 99.2 at 1. Pinterest further disclosed that its ARPU increased 29 percent year-over-year. *Id.* The company raised its guidance for 2019 revenue from $1.055 billion and $1.08 billion to $1.095 billion and $1.115 billion based on its second quarter results. Ex. E. at Ex. 99.2 at 3.

In Pinterest's October 2019 third quarter results, Pinterest disclosed that its global MAUs increased by 22 million and its U.S. MAUs increased by 2 million. Ex. E at Ex. 99.2 at 1, 2. Its ARPU increased 14 percent year-over-year. *Id.* The company again raised 2019 revenue guidance to a range of $1.1 billion and $1.115 billion. Ex. E at Ex. 99.2 at 3. At the end of 2019, Pinterest exceeded the top end of its revenue guidance with $1.143 billion in 2019 revenue. Ex. F at Ex. 99.2 at 1.

Defendants' motion to dismiss argues that Hessong's own allegations and the judicially noticeable facts demonstrate that Pinterest actually increased its domestic MAUs and ARPUs during and after the Class Period and that Pinterest consistently met its revenue guidance; as such, Hessong cannot allege Pinterest made any false or misleading statements regarding MAU growth or ARPU growth. MTD, Dkt. No. 32. In opposition, Hessong clarifies that he is not asserting a claim regarding Pinterest's revenue guidance, but he is challenging the false and misleading statements Pinterest has made regarding the growth of its two key metrics, domestic MAU and

---

[2] Exhibits to Liming Decl., Ex. A (Form 424B4 filed with SEC April 18. 2019); Ex. B (Form 10-K filed with SEC February 7, 2020); Ex. C (Form 8-K, filed with SEC on May 16, 2019); Ex. D (Form 8-K, filed with the SEC August 1, 2019); Ex. H (Form 8-K, filed with the SEC April 27, 2021); Ex. I (Form 8-K, filed with the SEC February 4, 2021); Ex. M (Form 10-K, filed with the SEC February 5, 2021); Ex. N (Form 10-Q, filed with the SEC August 2, 2019).

6

ARPU. Oppo., Dkt. No. 35, at 8 n.4. He also clarifies that his theory of liability is based on omissions; specifically, that when defendants chose to speak "and tout Pinterest's present and future prospects relating to U.S. user base growth and U.S. ARPU," they were obligated to disclose "adverse information about the significant deteriorating trend in user growth and the impending saturation of the U.S. market, which Defendants failed to do." *Id*. at 7–8.

For the reasons explained below, defendants' motion to dismiss is GRANTED, but plaintiff is given leave to amend.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570. In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), securities fraud claims must "plead with particularity both falsity and scienter." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). This is the same standard under Federal Rule of Civil Procedure 9(b). With respect to falsity, "the complaint must specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). With

respect to scienter, "the complaint shall, with respect to each act or omission alleged . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts, and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citation and internal quotation marks omitted).

"To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). (quotation marks and citation omitted). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012) (citation omitted). Accordingly, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[A]n inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences. *Id.* at 324. "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23.

## DISCUSSION

To state a claim under Section 10(b) of the Exchange Act a plaintiff must allege both a fraudulent state of mind and a material misrepresentation or omission. *Police Ret. Sys. v. Intuitive Surgical, Inc.*, No. 10-CV-03451-LHK, 2012 U.S. Dist. LEXIS 71429, at *24 (N.D. Cal. May 22, 2012), *aff'd*, 759 F.3d 1050 (9th Cir. 2014). Hessong's FAC appears to attempt to allege both false statements of material facts *and* misstatements by omission of material facts regarding the slowing or decreasing growth rate in domestic MAUs given the "saturation" of the U.S. market

8

and the attendant risk to domestic ARPU from that slowing "growth rate." FAC ¶ 35. In his opposition, he clarifies that his theory is omissions-based. Oppo. at 7–8.

The PSLRA requires that a plaintiff plead specific facts that demonstrate why a statement is misleading. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). Listing statements and failing to connect those statements to specific falsities or explanations why the statements are misleading is insufficient. *Id.* In the Amended Complaint, Hessong quotes Pinterest and the individual defendants' statements extensively with little to no explanation showing why the statements are misleading. FAC ¶¶ 23–32; *see also In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000) ("The [italicized] portions are presumably meant to indicate or to emphasize false or misleading statements, although that supposition is not certain because [P]laintiff[] allege[s] few corroborating factual details suggesting that the statements are false or misleading.").

Hessong scatters three vague explanations why two of the identified statements are misleading. In Paragraph 26, he states that Pinterest "*provided shareholders with an unrealistic outlook on its future U.S. revenue*" when it wrote in a letter to shareholders, "We expect to maintain strong momentum in our business as we achieve larger scale. We expect revenue to grow 40%-43% compared to full-year 2018, driven by improving ARPU, particularly in the U.S. We expect to grow users in both the U.S. and International." FAC ¶ 26 (emphasis added). In Paragraph 30, he states that the individual defendants "*continued to exaggerate the forecast*" and made "*rosy predictions*" when they "touted" Pinterest's actual growth rate numbers and increased users and stated "[W]e continue to accelerate the growth in the number of advertisers on the platform. We talked last quarter about having done that and we accelerated yet again in the number of advertisers this quarter as well. Longer term, we would expect price to continue to improve because advertisers tell us that they're getting a great return from their investment on Pinterest. So today the exercise is trying to get as many advertisers on the platform. So that they all see the value and help us build a lot more robust auction." FAC ¶ 30 (emphasis added).

Hessong does not challenge Pinterest's revenue guidance; indeed, the general references to "improving" domestic ARPU and "growing users" in Paragraph 26, turned out to be true. *City of*

9

*Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2019 U.S. Dist. LEXIS 216801, at *37 (N.D. Cal. Dec. 17, 2019) ("Plaintiff . . . failed to allege specific facts that demonstrate[d] the falsity of Defendants' statements regarding Oracle's Cloud revenue growth — because that revenue was, in fact, growing throughout the Class Period as predicted."). Moreover, the growth discussed in Paragraph 30 is growth in the number of advertisers (not users) given the increasing value provided by the platform. Hessong fails to adequately identify the specific misstatements that he contends are actionable in his Amended Complaint. He compounds that deficiency by failing to allege the contrary facts that were known to Pinterest at that time, which would show why the identified statements were misleading based on the theory that Pinterest was required to disclose its knowledge of the existing deceleration in the domestic MAU growth *rate* and its impact on domestic ARPU.

In his Opposition, Hessong points to two alleged misstatements by defendant Morgenfeld that he contends are actionable misstatements based on omissions: Morgenfeld saw "***comfortable room in all of our markets***, in particular in international markets *but also in the US*, to continue to drive advertising content higher" and "***expect[s] to grow users [in] . . . U.S.***" Oppo. at 9 (emphasis in original, citing FAC ¶¶ 27 & 29). Hessong claims that these statements "had no basis" because at that time Pinterest was supposedly "experiencing significant deterioration of the MAU growth" in the U.S., its most "lucrative market." *Id.* But the statement "comfortable room" does not refer to growing U.S. users, it refers to advertising content and growing number of advertisers. FAC ¶ 27. Hessong does not allege defendants made false or misleading statements about room to drive advertising content or advertiser numbers higher. And he does not dispute the truth of the second very generalized statement, that Pinterest "***expect[ed] to grow users in both the U.S.*** and international. Consistent with trends in recent years, we expect to grow International users at a faster pace relative to the U.S." *Id.* ¶ 29 (emphasis in original). Instead, he complains that the growth rate of users in the U.S. was decreasing, which would have an unspecified impact on U.S. ARPU.

The statement Hessong identifies does not discuss growth *rate* or ARPU.[3] And there are no facts alleged showing why the lukewarm and generalized growth statements about users could be false concerning growth rate or ARPU. For example, he alleges no facts showing why Pinterest's domestic market was so saturated that the user growth statements were necessarily known by Pinterest to be misleading, much less facts showing that declining U.S. growth rate meant that ARPU would fall. Contrary to Hessong's assertion in his opposition (Oppo. at 9–10), there are no facts in the Amended Complaint showing or supporting a plausible inference that domestic MAU was experiencing "significant deceleration" at the time the statements were made.

Finally, the very generalized statements identified by Hessong — *e.g.*, discussing the "comfortable room" to drive advertising content higher, that defendants were "particularly encouraged" by the strength they saw "in U.S. revenue and international user growth," and were "encouraged by strong underlying trends in U.S. ARPU and user growth in international markets" — verge on inactionable statements of corporate optimism. *See, e.g., In re Pivotal Securities Litig.*, 3:19-CV-03589-CRB, 2020 WL 4193384, at *13 (N.D. Cal. July 21, 2020) (statements that "we remain excited" about a product, "we feel like we are unmatched in the market," "feeling very good about the number of new customers and logos," "feeling pretty optimistic about the pipeline," and "we're comfortable with current [revenue] expectations" are inactionable statements of opinion). Even Hessong characterizes these statements as "rosy predictions" or vague "exaggerations." FAC ¶ 30. His Amended Complaint fails to show why these very generalized statements of optimism created a false impression on the market that differed in a material way from the reality Pinterest faced. *Metzler Inv. GMBH*, 540 F.3d at 1070 (discussing the PSLRA's "exacting standard" requiring plaintiffs to plead specific facts demonstrating why statements create a material misimpression).

Hessong is wrong when he contends that the "comfortable room" and "grow users" statements are analogous to actionable statements in *Shenwick v. Twitter, Inc.,* 282 F. Supp. 3d

---

[3] Many of the other "false and misleading statements" identified in the Amended Complaint suffer from similar problems; they discuss matters and metrics *other* than domestic MAU or ARPU or are not tied to any potential impact on domestic MAU or ARPU.

11

1115, 1127 (N.D. Cal. 2017). Oppo. at 9–10. There are significant distinctions between the challenged statements in that case and those here. First, the *Twitter* defendants made very specific statements regarding "acceleration" and "turnaround" on its key MAU metric at the same time that Twitter was experiencing flat or declining "daily active user" trends and other problems with user engagement, making the touted MAU growth implausible. *Id*. at 1136–37. The statements here regarding user growth were very generalized; no specific statements were made regarding domestic MAU or ARPU. Moreover, unlike *Twitter* where there were facts alleged to support plaintiff's theory — that "Twitter reported positive MAU growth, that Twitter was simultaneously experiencing adverse DAU trends, and that those DAU trends made MAU growth implausible," *id*. at 1137 — here there are no facts alleged supporting the existence of negative "trends" at the time the admittedly positive but unspecific statements about user growth were made by defendants.[4]

The Amended Complaint must be dismissed given its two overarching deficiencies: (i) the failure to identify actionable misstatements or omissions regarding MAU growth rate or ARPU, or statements necessarily connected to and impacting MAU or ARPU; and (ii) the failure to allege facts showing potential saturation of the market and why that alleged saturation would necessarily make identified statements regarding MAU or ARPU rates false or misleading.

Given this conclusion and the need for Hessong to amend, I need not separately address scienter or whether currently-identified statements are forward-looking statements protected by the PSLRA's safe harbor provision. I will point out that if he intends to rely on the "core operations doctrine," he needs to allege facts showing why the executives would have had knowledge of the decelerated growth rate for domestic MAUs, its impact on ARPU, and that Pinterest had reached or was approaching the finite limits to its domestic user base at the time the actionable statements

---

[4] Nor are the statements in this case like those in *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp*., 380 F.3d 1226 (9th Cir. 2004), another case relied on by Hessong. There, Oracle's statements that "the declining U.S. economy was not hurting its business and that Oracle would earn twelve cents per share and would see applications revenues grow 75% and database revenues grow 25%", as well as Oracle's statements that the 11i Suite were on track were actionable when each of those specific statements turned out to be false and discoverable given Oracle's tracking of sales and statements from former employees and managers testifying to a major slowdown in sales. *Id*. at 1230–31.

were made. Those facts are missing from the current Amended Complaint.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is GRANTED, with leave to amend. Hessong shall file his Second Amended Complaint ("SAC") within twenty days of the date of this Order. Defendants shall file a response or further motion to dismiss within twenty days thereafter. Assuming that defendants file a motion to dismiss the SAC, the briefing and hearing schedule is as follows: plaintiff's opposition is due twenty days after the motion is filed and defendants' reply is due twenty days after the opposition is filed. The hearing shall be set for 14 days or more after the reply is due.

**IT IS SO ORDERED.**

Dated: September 23, 2021



William H. Orrick
United States District Judge

13