Pages 1 - 16

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

PAUL HESSONG, on behalf of himself )
and all others similarly situated, )
                                   )
            Plaintiffs,       )
                                     )
   vs.                            ) No. C 20-08243 WHO
                                     )
PINTEREST, INC., et al,         )
                                     ) San Francisco, California
           Defendants.       ) Wednesday
                                     ) September 15, 2021
_____) 1:30 p.m.

**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:          LOWEY DANNENBERG, P.C.
                            44 South Broadway
                            Suite 1100
                            White Plains, New York 10601
                  BY: **ANDREA FARAH, ESQ.**

                            BLOCK & LEVITON LLP
                            100 Pine Street
                            Suite 1250
                            San Francisco, California 94111
                  BY: **WHITNEY E. STREET, ESQ.**

For Defendants:         FRESHFIELDS BRUCKHAUS DERINGER US LLP
                            2710 Sand Hill Road
                            Menlo Park, California 94025
                  BY: **BORIS FELDMAN, ESQ.**
                                 **DORU GAVRIL, ESQ.**

*Reported By:*    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                    *Official Reporter - US District Court*
                    *Computerized Transcription By Eclipse*

**Wednesday - September 15, 2021**                    **1:58 p.m.**

                    **P R O C E E D I N G S**

                        **---000---**

        THE CLERK:  Calling Civil Case No. 20-8243, Hessong versus Pinterest, Incorporated.

    Counsel, if you would, please, state your appearance for the record.

        MS. STREET:  Hi.  This is Whitney Street from Block and Leviton for plaintiff.

        MS. FARAH:  Hi.  Good afternoon.  Andrea Farah from Lowey Dannenberg for plaintiff.

        MR. FELDMAN:  Good afternoon, Your Honor.  Boris Feldman of Freshfields Bruckhaus Deringer for the defendants.

        MR. GAVRIL:  And good afternoon, Your Honor.  Doru Gavril for defendants also from Freshfields.

        THE COURT:  Great.  Well, good afternoon to all of you.

    Let me tell you how I am I'm thinking about this.  I'm inclined to dismiss with leave to amend.  Essentially I don't see any actionable misstatements or omissions regarding the MAU growth rate or the ARPUs.  I think there is a failure to allege facts regarding the potential saturation of the market and why that makes statements false or misleading.

    Fundamentally, the plaintiffs need to plead specific facts that show the misleading nature of the statements, which I

think is -- is missing here.

I don't think this is a case like *Shenwick versus Twitter* where the statements were specific and wrong.  Here the statements are generalized and basically right.

So that's the -- that's how I'm looking at it.  And so either Ms. Farah or Ms. Street, if you want to explain to me why I've missed the boat on this, let me know.

**MS. FARAH:**  Yes, certainly.  So thank you, Your Honor.  Thank you.  I appreciate the tentative.

I think what is important to bear in mind through all this is the context in which this is -- this whole thing is occurring and the context -- the background on which these statements are being made.

So you know Pinterest being the media service provider generates revenue from one and single stream.  And that is by allowing advertisers to place their content on their network; right?  And the idea is that ultimately users will be taken down the purchasing funnel and may buy merchandise from third parties.

So, and because of that revenue model there are only so many factors that matter in that company.  And one of them is U.S. MAU, and the other one U.S. ARPU.  You know, MAUs being Monthly Active Users; meaning, somebody who logs in once in 30 days.  And the ARPU, you know, revenue generated in that given geography divided by the number of MAUs.

So these two metrics, in essence, define the company's success. They define its prospects. They define its profits. They define the company's ability to essentially generate revenue; right?

And these are also the metrics that all of these analysts closely track, report on. These are the metrics that executives constantly discuss in their earnings calls with analysts, in their regulatory disclosures and press releases. And essentially they are the metrics that investors rely on when they are making their purchasing decisions.

And so the idea here is that the -- the crux of the allegation is that defendants have made statements that portray the company operations and then current state of affairs that was materially different than the reality.

And on top of that, Pinterest also amended to disclose material information where such omission created the impression that the company was performing and will perform better than it was and could.

And so to speak in more specifics, we alleged that there were underlying trends, both in the U.S. MAU and in ARPU that were known to defendants but undisclosed to the market. And those trends were of such nature because of their importance that they required defendants to be aware of them and required them to speak to their knowledge; right?

And so you have these statements to describe them in

general terms.  You have these enthusiastic statements where -- where the executives are all exuberant about the MAU and ARPU. They are using statements such as "particularly encouraged by the strength we saw in U.S. revenue."  "Strong underlying trends."  "Comfortable room for growth."  "Encouraged by the trends."  And so they all conveyed one message.

And no matter how much defendants want to slice and dice these statements into million pieces to a point where they make no sense, I think the way to look at them is it has to be cohesively.

I understand that for purposes of falsity we have to evaluate each statement separately, but that doesn't mean that you can completely segregate and separate these concepts.  They are really closely intertwined.

So when you're talking about U.S. revenue, it has that component of U.S. MAU and U.S. ARPU.  Where you're talking about monetization, you're really talking about ARPU, which is just the measure of monetization.

So I think they have to be taken in conjunction with each other and looked at together cohesively because they oftentimes are derivatives of each other and they are proxies to each other.  When one of these factors move, the other factors move as well.

And so the idea here, the critical question I think is what is the message that these statements are conveying to the

public.  And what they convey is that there are trends that are being observed and experienced by defendants that predispose Pinterest for future growth; right?

And to highlight that growth, defendants are relying on row numbers.  They are reporting MAUs.  And what is particularly problematic about those is also they're reporting year over year.  They are actually referencing numbers that go to pre-IPO era where there is reduced visibility and reduced transparency when it comes to the numbers.

And so -- so when you look at the numbers sequentially, that's when you really see the trend.  And that misleading nature of the reporting itself is then compounded by the omissions.  Where -- where there are trends that --

THE COURT:  Ms. Farah, what is the misleading nature? What specifically is it that you think was either false or misleading?  That's the thing that I'm not able to get from your Complaint as it's -- as it's stated.

MS. FARAH:  Yeah.  I think the case is analogous to *Twitter*, because there as well you had these executives reporting on the MAUs and at the same time they are experiencing trends that cut against those positive news and they are not disclosing those.  I don't see how this would be any different.

The executives are out there speaking to MAUs when there is an underlying trend that -- that is adverse to those news.

Yet, the trend is never passed on on the executives.  And you can see this.

It's pretty remarkable.  When the truth actually comes out in October 2019, you see what happened.  The company once again comes out with positive news saying:  Hey, we got 87 million MAUs, which represents 8 percent growth.

But you have to realize that this is the third regulatory cycle where the company operates as a public company.  And despite the fact that they are coming up with positive news, this time the analysts are not buying it, and they are saying: Hey, wait a second.  That 8 percent growth you're reporting really isn't an 8 percent growth.

The way to look at it is that that is a six point deceleration when you look at the numbers sequentially, quarter after quarter, and it also is a two point deceleration when you look at it sequentially over a longer period of time.  So you see, that's pretty interesting.

And the same you see after the class period.  Pinterest is still coming out with numbers where the MAUs are supposedly increasing, yet their shares tank on every single one of those disclosures because the MAU has now completely flattened; right?

And they don't deny that it has flattened.  We're at the point where the executives are simply saying:  Okay, it's flat and we don't know what it comes back.

So to -- so that's the misleading part, is that there is a trend that they are aware of.  That is a trend that investors cannot figure out on their own.  They rely on what the defendants are telling them, and all they hear are these super positive statements regarding what they are observing, what they are seeing and how much room there is for growth.

So the idea that -- and so for defendants to say that simply because these numbers are truthful, these row numbers are truthful, that doesn't mean that that renders these misleading statements not misleading; right?

Just the fact -- just because Pinterest was able to add some MAUs, that is not sufficient to shield the disclosures from -- from liability if they, in fact, convey something misleading.

The problem is that the disclosures required by the securities laws is not measured by their literal truth; right?  They are measured by the ability to accurately inform rather than mislead the prospective buyers.

And so even statements that are objectively and literally accurate may be misleading when you take into consideration the context and the manner in which they are presented.

And I think that's exactly what was at issue with *Twitter*; right?  And in this regard --

**THE COURT:**  Well, I actually think with *Twitter* there were much more specific statements that Twitter made, which

could be verifiably shown to be not accurate.

So if -- I mean, one thing that I would suggest, because I am going to give you leave to amend, is that you lay out with as much specificity as you can what appears to be your theory, which is that although facts that Pinterest was providing were true, the gestalt of their generalized statement was rendered, all of what they were factually saying is true, as misleading. If that's -- if that's what the theory is, then let's address that specifically.

**MS. FARAH:** Right.  Yes, Your Honor.  And I think in all fairness, I believe that the Complaint can benefit from some clarity and from, you know, parsing these statements with little bit more preciseness.  So, but I don't think that that is something that we couldn't cure through amendment.  So well definitely do that.

I -- in terms of addressing some of the other arguments, to the extent necessary, you know, there is -- defendant has offered, you know, corporate optimism as one of them.  And so the question here is are these statements really so vague and really so exaggerated that as a matter of law no reasonable investor could rely on it in considering them when making, you know, purchasing decision.  And that is not the case here.

Defendants simply take some of these words and they cherrypick them from the misstatements and try to equate them with other cases without, again, giving context, without giving

the circumstances, as if these words alone had some magical effect of rendering misleading statements not misleading.

And, you know, the analysis in the *Quality Systems* case that we have cited perfectly addresses that problem.  These even general optimistic statements when they are taken in their context may nevertheless be a basis of securities fraud when those statements address specific aspects of the company's operations.

And that is, I think, what is the problem with majority of the cases the defendants are citing, such as, you know, *Align Technology, Intuitive -- Surgical Intuitive*.  These cases are really different because the context and the scope of what we're looking at is different.

These are companies, multi-billion dollars companies that operate in multiple different business segments with dozens of products, with thousands of employees, with thousands of trained doctors.  And so when the company executives come out and say, hey, there is plenty of room, great revenue, great quarter, everything is going great, the granularity of that statement is much less than when you consider U.S. MAU or U.S. ARPU in a company of Pinterest's scale that offers one platform in one geography to a very narrow group of people and where basically two metrics matter.

So the specificity of that statement in Pinterest becomes exponentially greater than in all of the cases the defendants

cite to to equate their statements to this.

You know, in terms of the forward-looking statements, again, I don't think that they actually deserve the protection of PSLRA safe harbor.  PSLRA does not protect statements that officials know are materially false regarding current or past facts.

And, again, this is *Quality Systems*, where defendants were speaking as to then existing state of affairs; right?  And that's exactly what you have here.

You have executives not speaking what will be tomorrow, what will be in the next quarter.  They are saying:  We are seeing strong trends.  We are observing underlying trends.  We see comfortable room.

So it's not that they are -- they may be bootstrapped onto some forward-looking statements, but that doesn't turn -- that doesn't deserve them a PSLRA protection; right?

And the *Quality Systems* case makes a really good way of explaining how these mixed statements are being treated, which is exactly how they should be treated here?

In any event, even if they were forward looking, they still do don't deserve the PSLRA protection because of the lack of cautionary language.  Defendants have offered a few of those statements, and I just want to highlight one of them because it cuts across other argument --

THE COURT:  Ms. Farah, I just want to make sure that

you're -- that we're communicating on this.

I think there's a fundamental issue before you get to those arguments, and that is laying out why it is that the statements are false or misleading.  You don't have to get much further than that.  And your Complaint really needs to sharpen the focus and lay out the facts, the specific facts that would make that so.

So that's really what I think you need to focus on.  There may be other issues with the Complaint, but that's sort of fundamental at this point.

**MS. FARAH:**  Well, okay.  All right, Your Honor.  I understand.

And so, I mean, to the extent Your Honor wants to hear any other arguments or any other points that were raised in the papers, I'm more than happy to answer.  But I think I hear you to say that that is the initial threshold that we need to overcome before we even address the others.  So if that's the case, I'm more than happy to, you know, sit back and hear what defendants have to say and maybe then respond.

**THE COURT:**  So Mr. Feldman or Mr. Gavril, is there anything you would like to respond with?

**MR. FELDMAN:**  Thank you, Your Honor.

I, pun intended, would like to put a pin in Exhibit M, which was the company's Form 10-K for fiscal year '20, Pages 52 to 55.

I have read enough decisions by the Court that I know you're going to let them amend. I do not believe they will be able to amend around that pin.

Those pages show by quarter MAU globally and divided into U.S. and non-U.S. They show ARPU broken down. They show revenue broken down.

So counsel can be as vehement as she would like about trends and analysts were disappointed, but the fact is when you have those numbers, you can determine the trend yourself. And that is the fundamental flaw here.

This is not a case like *Twitter* in which multiple confidential witnesses said what they are saying about MAUs is a lie. There is no contest here about the Monthly Active User data, all of which was available to the market on a quarterly basis.

So when we're back after the Amended Complaint with a Motion to Dismiss, I'm going to begin by asking you to go back to Pages 52 to 55 of the annual report for FY '20.

Thank you, Your Honor.

**THE COURT:** Okay. Thank you, Mr. Feldman.

Ms. Farah, do you have any last words with respect to the pin?

**MS. FARAH:** Yes, I do.

So it is not the case that, you know, investors and analysts can determine the precise MAUs and what's going on,

because -- and this is something that cuts across all of their papers.  They are basically conflating users with MAUs.

An MAU is simply somebody who has been active on the account in the 30 days; right?  That doesn't equate to a unique user.

So you can -- one unique user can have multiple accounts.  On top of that you can have somebody who has been inactive in the prior 30-day period and now logs in and becomes an MAU.  There is no transparency into that.  Investors have no idea how they could ever gain the type of visibility to determine who has been previously active and who not.

And that's not even speaking about the fact that Pinterest has a number of spam accounts that they are trying to delete on a continuous basis when they identify them.  So it just adds to the conflation and to the -- to just the lack of visibility as to how MAUs are -- are calculated.

In *Twitter* the MAU number and the number of fake accounts was actually disclosed.  So there investors could just take those off of the total numbers and really understand how many users, how many active users exist.  We don't have that here.

So it's not very useful to me to see the numbers change time and again when there are at least three or four factors that contribute to it, where there is no visibility to those, and nobody knows how those numbers are calculated and what is the methodology by which they are determined.

So that pin is just really useless for investors.

**THE COURT:** Okay.  I imagine that we'll talk about it the next time.  And so I will give you -- it will take me a few days to get an order out, and then I'll give you 20 days from there to just sharpen the focus of what you think is false, if anything is actually false or misleading, and why that is, specific facts.

**MR. FELDMAN:** Your Honor, thank you.

Would it be useful while we're all together to avoid transaction costs to enter the whole schedule, which would be 20 days from your order, 20 days for us to move to dismiss, 20 days for an opposition, 20 days for a reply, and then a hearing at your convenience?

**THE COURT:** That's fine by me.  Does that work for the plaintiffs?

**MS. FARAH:** Yes, Your Honor.  Sure.  We will make it work.

**THE COURT:** Okay.  Thank you.

**MR. FELDMAN:** Thank you.

**THE COURT:** Then why don't you set a hearing date for a Wednesday that is at least two weeks after that.

**MR. FELDMAN:** And do you think we're going to be able to come see you in person for that one, Your Honor, or will we still be on television?

**THE COURT:** You know, I would love to see you always,

Mr. Feldman.  The -- the short answer is I don't know.

I -- the -- I think my general rule going forward, because I find that these video hearings are as good for me in almost every case as in-person ones, I think I'll give people the option if people want to come in.  If I was a lawyer, I would want to come in just because I like being in court.  So, and I will accommodate people who want to be in court, and I will accommodate myself if people don't want to be.

MR. FELDMAN:  Thank you, Your Honor, very much.  Have a good day.

THE COURT:  Okay.

MS. FARAH:  Thank you.

THE COURT:  Thank you all.

(Proceedings adjourned.)

Debra L. Pas, CSR, RPR, RMR, CRR
Official Reporter - U.S. District Court - San Francisco
(415) 431-1477

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, September 23, 2021